## MITCHELL et al. v. STANTON.

(Court of Civil Appeals of Texas. San Antonio. June 28, 1911. Rehearing Denied Oct. 4, 1911.)

1. TRIAL (§ 188*)—INSTRUCTIONS—"PRESUMPTION OF LAW"—"PRESUMPTION OF FACT"—PROVINCE OF JURY.

A presumption of law is a rule of law which the court draws from the requisite facts before it, and it must charge the jury to find in accordance therewith, while a presumption of fact is an inference of fact which cannot at common law be made without the intervention of the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 412; Dec. Dig. § 188.*

For other definitions, see Words and Phrases, vol. 6, pp. 5537–5540; vol. 8, p. 7762.]

2. TRIAL (§ 139*)—QUESTIONS FOR JURY.

Where the evidence on any question of fact is such that minds honestly desiring to determine the matter cannot disagree, the question is one of law, and the court may so charge, but, where such minds may disagree, the matter is for the jury.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 332; Dec. Dig. § 139.*]

3. TRIAL (§ 188*)—INSTRUCTIONS—INVADING PROVINCE OF JURY.

The court may not in its instructions indicate a presumption of fact, however potent it may be in determining the question at issue, but the jury may consider it in reaching a proper conclusion from the evidence.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 412; Dec. Dig. § 188.*]

4. EVIDENCE (§ 91*)—BURDEN OF PROOF.

A party asserting that a purchaser of headright certificates or persons claiming under him had retransferred the certificates to the original holder or persons claiming under him, has the burden of proving the fact.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 113; Dec. Dig. § 91.*]

5. PUBLIC LANDS (§ 178*)—HEADRIGHT CERTIFICATES — TRANSFERS — RETRANSFERS — EVIDENCE.

A holder of headright certificates conveyed them to a purchaser, who a few months later died leaving a will, whereby his executors were directed to hold his property in trust for a person named, who died intestate, leaving a son who was a lunatic. While the purchaser lived, neither the holder nor any one claiming under him asserted that the certificates had been retransferred, but more than six years after the purchaser's death the holder claimed a retransfer, but the basis of his claim was not shown.

---

Possession of the original certificates and of the land by the holder or persons claiming under him after the date of the conveyance to the purchaser was negatived. *Held* not to show a retransfer of the certificates.

[Ed. Note.—For other cases, see Public Lands, Dec. Dig. § 178.*]

6. ADVERSE POSSESSION (§ 43*) — TACKING POSSESSION.

The possession of the holder of a headright certificate sufficient to supply a predicate for the presumption of a retransfer by a purchaser of the certificate cannot be tacked to the possession by one not claiming through the holder, but through a third person having no title from the holder or from any other source.

[Ed. Note.—For other cases, see Adverse Possession, Cent. Dig. §§ 213–225; Dec. Dig. § 43.*]

7. LIMITATION OF ACTIONS (§ 74*)—INSANITY.

Possession under a claim of title which begins after the owner has been adjudged a lunatic cannot ripen into title by limitations; the statute not running against a lunatic.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 413; Dec. Dig. § 74.*]

8. TRESPASS TO TRY TITLE (§ 25*)—STALE DEMANDS—THIRD PERSONS.

A person's assertion of title to land as against a stranger to the legal title is not affected by the doctrine of stale demand.

[Ed. Note.—For other cases, see Trespass to Try Title, Cent. Dig. § 30; Dec. Dig. § 25.*]

9. TRIAL (§ 252*)—INSTRUCTIONS—INAPPLICABILITY TO EVIDENCE.

It is not error to refuse a charge correctly stating the law, where there is no evidence on which it can be predicated.

[Ed. Note.—For other cases, see Trial, Cent. Dig. § 596; Dec. Dig. § 252.*]

10. INSANE PERSONS (§ 26*)—INQUISITIONS—ADJUDICATION—EFFECT.

An adjudication by a court of competent jurisdiction that a person is a lunatic, followed by his commitment to a lunatic asylum where he has continuously been detained, fixes the status of such a person as a lunatic, and, in so far as it affects his rights, is notice to every one while it subsists and is in force by his detention.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. §§ 35, 36; Dec. Dig. § 26.*]

11. INSANE PERSONS (§ 98*) — ACTIONS BY GUARDIAN — LUNACY PROCEEDINGS — EVIDENCE.

In trespass to try title by the guardian of a lunatic, the complaint on which the inquisition of lunacy was heard, the judgment adjudicating the person a lunatic, and the warrant of commitment to an asylum and the return thereon made by the sheriff are admissible to show that the jurisdiction of the court was properly invoked, and to show prima facie lunacy.

[Ed. Note.—For other cases, see Insane Persons, Cent. Dig. § 173; Dec. Dig. § 98.*]

12. WILLS (§ 138*)—NUNCUPATIVE WILL.

A nuncupative will does not pass title to realty.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 350; Dec. Dig. § 138.*]

13. EVIDENCE (§ 353*)—HEADRIGHT CERTIFICATES—TRANSFERS—ADMISSIBILITY.

A written transfer of a headright certificate executed in the manner prescribed by Act Feb. 5, 1841 (Laws 1840–41, p. 169, § 20), in force at the time, is properly admitted in evidence.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1404–1431; Dec. Dig. § 353.*]

Appeal from District Court, Victoria County; Jno. M. Green, Judge.

Action by William E. Stanton against O. Mitchell and another. From a judgment for plaintiff, defendants appeal. Affirmed.

Coke, Miller & Coke, for appellants. Willett Wilson and Proctor, Vandenberge, Crain & Lewright, for appellee.

NEILL, J. This is a suit of trespass to try title to J. W. Black 640-acre survey and the Samuel Sanderson 320-acre survey, situated in Victoria county, Tex., brought by the guardian of appellee, a lunatic, against the appellants. The defendants pleaded not guilty, and five and ten years' limitation. The case was tried before a jury, and resulted in a verdict and judgment in favor of appellee for an undivided one-half interest in both surveys.

The defendants requested the court to give this special charge: "Gentlemen of the jury, you are instructed to return a verdict for defendants." Its refusal is the predicate for the first assignment of error, under which is asserted this proposition: "The evidence is such that the court should have presumed as a matter of law a transfer from Ewing or those succeeding to his rights to J. W. Black or those succeeding to his rights of the certificates in question or the land upon which the same were located." The facts pertinent to the proposition appearing from the record may be stated as follows: A conditional headright certificate No. 151, for 640 acres, was on December 16, 1839, issued to J. W. Black, and an unconditional headright certificate, No. 21, for 640 acres, was issued to him June 4, 1844, each of which was filed in the General Land Office on August 9, 1845. On September 7, 1841, a conditional certificate, No. 230, for 320 acres, was issued to Samuel Sanderson, and filed in the General Land Office May 25, 1855. An unconditional certificate, No. 10, for 320 acres, was issued to said Sanderson July 4, 1842, which was filed in the General Land Office February 29, 1860. A duplicate certificate, reciting the loss of the unconditional certificate No. 10, was issued to Sanderson May 20, 1855, numbered 3995–4096, which was filed in the General Land Office May 29, 1855. On February 7, 1842, Samuel Sanderson transferred his conditional certificate, No. 230, above mentioned, to John W. Black, and on the same day he gave Black a bond, conditioned that he would apply for and obtain a patent to the land covered by the certificate, and make due conveyance thereof to him. On September 9, 1852, Sanderson executed to Black another transfer, convey-

ing the unconditional certificate, No. 10, above mentioned, referring to the transfer of the conditional certificate in 1842. This transfer was filed for record in Victoria county September, 1852. On January 24, 1846, John W. Black by his deed of that date conveyed his headright certificate for 640 acres and the Sanderson certificate for 320 acres to William G. Ewing. Wm. G. Ewing, the grantee in said conveyance, died October 26, 1846, leaving a will in which he devised and bequeathed to George S. Peacock and James Denison, his executors named in the will, in trust for the sole and exclusive use and benefit of his sister, Juliet Stanton, all of his estate, real and personal, of whatsoever nature and description, which will was duly entered into probate in the county court of Calhoun county, Tex. Juliet Stanton, the beneficiary of the property devised in trust to said executors, died intestate in 1879, leaving two sons surviving her, viz., Wm. E. Stanton, the appellee, and Ben Fretwell, a son by a third husband. The appellee was a lunatic at the time of her death, and was adjudged insane by the county court of Dallas county on April 23, 1887, and on the 26th of said month by an order of said court was placed in the lunatic asylum at Terrell, Tex., and has remained there, a hopeless lunatic ever since.

In December, 1852, about six years after the death of William G. Ewing, John W. Black made affidavits of the loss of the original certificates, which he had transferred to Ewing, and applications for the issuance of duplicates thereof. The duplicates were issued upon his application, the originals, prior thereto, having been located on the land in controversy, and on July 5, 1855, the state of Texas issued a patent for John W. Black, "his heirs and assigns forever," for 640 acres, it being issued by virtue of unconditional certificate No. 21 of date June 4, 1844. And on August 10, 1855, a patent was issued by the state to Samuel Sanderson, his heirs and assigns forever, for 320 acres of land, said patent being issued by virtue of said conditional certificate No. 230 and duplicate certificate 3995–4096, both of which were sent by the Commissioner of the General Land Office to Edward Linn at Victoria, Tex. On February 8, 1855, John W. Black executed his last will and testament. His wife, Elizabeth C. H. Black, was appointed executrix, and made a devisee and legatee in said will. By it 960 acres of land situated on the prairie in Victoria county, Tex., it being the land in controversy, and located by virtue of said certificates, were devised to her. The will also devised and bequeathed to August, who is described thus in the will, "the young man I have raised," 320 acres northwest of the 960 acres above mentioned, and a further bequest to him is the increase of the testator's cattle for six years on condition that the said August take good care of the whole stock, and be kind and obedient to the testator's wife. In addition, the will contained this clause: "Also I give to August the orchard and all the shrubbery in my enclosures, houses and tenements therein at the death of my wife." Black died a few days after making the will, and it was duly probated in the county court of Victoria county, Tex., on March 22, 1855. The inventory of the property of his estate mentioned 1,280 acres of land, and it was agreed by counsel for either party to this suit that the 1,280 acres referred to in the inventory consisted of the J. W. Black 640 acres, the Samuel Sanderson 320 acres, and the Nicholson or Adam Murray 320 acres, all of which lies in one body, and that the tract intended to be devised August was the Adam Murray or Nicholson grant. There is on file among the papers of the estate a claim of Edward Linn against it for $41.48 for surveying Black's headright of 640 acres, 320 acres surveyed by virtue of the Nicholson certificate, and 320 acres surveyed by virtue of the Samuel Sanderson certificate, and also for expenses in obtaining the three patents $11.

Mrs. Elizabeth C. H. Black, wife of John W. Black, died on May 28, 1865, intestate as to all real property which she owned at the time of her death. August (the young man mentioned in John W. Black's will as August, who is not shown to be of kin to either John W. Black or his wife) under the name of August Black on May 28, 1870, conveyed to Henry S. McComb for the expressed consideration of $480 specie the said John W. Black and Samuel Sanderson certificates. This deed was filed for record February 9, 1871. Henry S. McComb died December 30, 1881, leaving a will which was probated in Wilmington, Del., the residence of the deceased, January 4, 1882, and which was duly admitted to probate in Victoria county on August 5, 1884. In the will the testator directed his executors to divide all of his real estate except his residence in the city of Wilmington into four parts or parcels, and that they should allot one of said parcels to Jas. Craig McComb, another to his daughter, Ellen Bush McComb, Jane Elizabeth McComb, and another to his daughter, Martha McComb. Thereafter the executors divided the real estate as directed in the will, and by the deed of August 25, 1882, allotted the Black and Sanderson certificates, above mentioned, to Ellen Bush McComb, which deed was filed for record February 28, 1885, in the office of the county clerk of Victoria county, Tex. Ellen Bush McComb married Francis S. Bangs on August 24, 1883. She died May 9, 1885, intestate, leaving the defendant Henry McComb Bangs her sole heir, who attained his majority on April 14, 1906. It is shown by the certificate of the Comptroller of Public Accounts that the taxes of the Samuel Sanderson survey of 320 acres in Victoria county were assessed to J. W. Black

for the year 1857; from then down to 1864 to E. C. H. Black; from 1868 to 1870 to Augustus Black; from then down to 1886 to H. S. McComb; from 1886 to 1906 to H. S. McComb's estate; and from then to 1909 to Henry S. Bangs. Practically the same is shown as to the assessment of taxes on the John W. Black 640-acre survey.

Defendants offered in evidence original tax receipts, showing payment of taxes upon said Black and Sanderson surveys for the following years: 1876, 1880, 1882, 1883, 1884, 1885, 1887, 1888, 1889, 1890, 1891, 1892, 1893, 1894, 1895, 1896, 1897, 1898, 1899, 1900, 1901, 1902, 1903, 1904, 1905, 1906, and 1908. Such of said tax receipts as were issued prior to the death of H. S. McComb recite the receipt of the tax money from him. Those issued subsequent to his death and prior to April, 1906, recite the payment of the tax money by the estate of H. S. McComb, and those issued afterwards recite the payment of the tax money by the defendant Henry McComb Bangs. The defendants offered in evidence a lease between Elizabeth B. McComb and James C. McComb, of Wilmington, Del., as trustees under the will of Henry S. McComb, parties of the first part, and John O'Brien, of Victoria county, Tex., party of the second part, whereby the party of the second part agreed to occupy and hold possession as tenants under the parties of the first part, their successor, successors, and assignees the two surveys in controversy from the 1st day of March, 1887, to the last day of February of the year 1888, and thereafter from year to year, to be terminable at the end of any year thereof on 30 days' notice from either party, the party of the second part agreeing to pay in advance to the parties of the first part, their successor, etc., an annual rental of $57.-60, payable in advance on the 1st day of March of each year during the term of the lease, which instrument was executed by the parties on March 1, 1887. They also offered in evidence another lease of the same character made on March 1, 1899, between James C. McComb and Martha McComb Bush of Wilmington, Del., as trustees under the will of Henry S. McComb, parties of the first part, and O. Mitchell of Victoria county, Tex., party of the second part, to the same lands, to hold the same from March 1, 1899, to March 1, 1900, and thereafter from year to year, terminable at the end of any year thereof on 30 days' notice from either party, the party of the second part agreeing to pay parties of the first part an annual rental of $57.60 in advance on March 1st of each year during the term of the lease, and to protect the land from trespass. It was agreed between counsel for the parties on the trial that the first lease above mentioned was delivered and became effective on June 10, 1887.

We will here observe that it does not appear from the record before us that either of said leases was ever recorded. There was testimony to the effect that the two surveys were inclosed in a large pasture which embraced a number of other surveys which O'Brien used for pasturing his cattle until the date of his death which occurred in 1895, and that after his death his ranch was divided, in 1896 or 1897, among his heirs, and that part which included the Black and Sanderson surveys was allotted to the wife of O. Mitchell, who testified as follows: "I held, and am still holding, possession of the Black and Sanderson surveys under above-mentioned lease. I have paid the rental mentioned in said lease annually to Mr. Theodore Buhler, agent. The lease has never expired. It runs from year to year. I have never been given any notice by the Bangs people or any one else of a desire to terminate the lease, and I have never notified them that I wanted to terminate it." The witness, here being shown the second lease above mentioned, then testified: "My recollection is that it was the first year after the division of the O'Brien ranch when I commenced paying rent for the Black and Sanderson surveys. It might have been in 1895 or 1896. I do not remember which year we divided up, but I have paid rent for them ever since. Mr. Buhler always has been the agent, and he charged me up with it every year." The evidence thus stated is as favorable to the proposition as the record will bear, perhaps more favorable. It is apparent from the indisputable facts shown by this evidence that the title to both surveys in controversy is in the appellee, unless such evidence destroys such title by conclusively establishing at the same time appellants' proposition under this assignment.

[1] If any presumption arises from this evidence, it does not belong to that class of presumptions called "intendments of law," which are inferences or positions established by law, common or statute, which the law peremptorily requires a certain inference to be made whenever facts appear which it assumes as the basis of that inference, that kind of a presumption which a judge is required to charge the jury to find in accordance with; and if he direct the jury contrary to it, or a jury should disregard such presumption, a new trial was at common law grantable as a matter of right. When any other species of presumption is overlooked or disregarded, the granting of a new trial has always been held to be a matter for the discretion of the court, which will be more or less liberal in this respect, according to the nature and strength of the presumption. The difference between this and other kinds of presumptions is that presumptions of law are in reality rules of law, and a part of the law itself. The court may draw the inference whenever the requisite facts are before it, while other presumptions, however obvious, being inferences of fact, could not at common law be made without the intervention of a jury.

[2] But, while this distinction between presumptions of law and presumptions of facts

still exists, it is now held that whenever the state of the evidence upon any question of fact is such that minds, honestly desiring to determine the matter properly, cannot disagree, it becomes a matter of law, and the court may so charge the jury. If, however, on the other hand, such minds, honestly desiring to determine the question properly, might disagree on the subject, then it is a matter of fact for the jury to decide. The writer has heretofore expressed his inability to fully appreciate this modern rule, humbly confessing his lack of such knowledge of the law as would enable him to decide when a matter of fact becomes a matter of law. He cannot now help observing that it is an innovation upon the constitutional right of trial by jury, and that it is fashioned so slenderly upon principles of reason and justice that it should be taken up tenderly and handled very gently.

Putting aside the writer's individual views on the subject, and considering the matter in view of the modern rule, the question presented by the assignment may be thus stated: Can any other conclusion be deduced from the evidence recited by minds honestly desiring to determine the matter correctly than that a transfer from Ewing or those succeeding to his rights to W. J. Black or those succeeding to his rights under the certificates in question or the land upon which they were located? If yea, then, under the rule stated, it is a question for the determination of a jury; if nay, it is a question for the court, which should be withdrawn from the jury, and they peremptorily instructed to find as a matter of law that such a transfer was made.

[3] In considering this question, due regard will be paid to every presumption of fact arising from the evidence that a jury could indulge, for though, under our judicature, a court may not indicate a presumption of fact, however potent its aid may be to them, in determining a question at issue (Stooksbury v. Swan, 85 Tex. 563, 22 S. W. 963; Jones v. Wright, 92 S. W. 1010; Munk v. Stanfield, 100 S. W. 213), a jury may apprehend and bring it into requisition when their minds balk in their effort to reach a correct conclusion from the evidence through the ordinary process of deduction or induction. Now, let us first see if the conclusion as a matter of law can be reached from the evidence by the ordinary process of reasoning, without invoking the aid of presumptions, which are, at best, but artifices to supply a link in the chain of reasoning which is missing, and without which a satisfactory conclusion as to the ultimate fact sought to be proved cannot be ascertained, that such transfer was made. An analysis of the testimony which appellant claims establishes as a matter of law a transfer of said certificates, or a conclusive presumption of such a transfer, shows no direct evidence, nor a single fact or circumstance, tending to establish such an irresistible conclusion. No one ever heard Ewing or any one claiming the land through him say that he had retransferred the certificate or the land to J. W. Black, or to any one claiming under him. No one ever knew or heard of such transfer being made. No one ever heard Black or any one claiming under him say or assert as his right to the land that Ewing had reconveyed the certificates to him. If there be any evidence at all tending to support the affirmative of this issue, it is of the most unsatisfactory character. It is said to be hard to prove a negative. In some instances it is. But it is harder to prove an affirmative by testimony which is in its character negative. Such an effort must generally end as it began, with an affirmation on the one hand and a negation on the other.

[4] The affirmative of this issue is asserted by the appellants; and hence upon them rests the burden of its proof. And to establish their proposition quoted under the assignment they must go beyond a preponderance of evidence and demonstrate it so clearly that no reasonable, fair-minded man can conclude aught but that it is proved as "a fixed fact," and, as such, becomes an "intendment of law"; yea, the law itself, so "that the probation bear no hinge nor loop to hang a doubt on."

[5] Who are they by whom and to whom such a transfer could have been made? None, unless by William C. Ewing to John W. Black himself. If made by Ewing, it must have been made by him between the date of the conveyance of the certificates by Black to him January 24, 1846, and the date of Ewing's death, October 24, 1846. During this period not a single fact or circumstance is shown by or appears from the evidence tending to show that such a transfer was made; and for it to have reinvested the title of the certificates it could have been made by no one else than Ewing, unless he had made a transfer of them to some one else, and such a one in turn, conveyed them to Black, of which there is not a scintilla of evidence. As long as Ewing lived, there is nothing tending to show that Black or any one else claimed or asserted ownership of the certificates. It was not until in December, 1852, over six years after death had sealed the lips of Ewing, that it appears any claim to the certificates was asserted by John W. Black. There was nothing to show upon what he based this claim, apparently inconsistent with the deed he had made to Ewing. If his claim had been a transfer of the certificates by Ewing to him, he would not in a suit against Ewing's heirs or legal representatives to establish it have been heard to testify to such transaction; for, death having closed Ewing's lips, the law would have closed his. Even such a claim of Black is simply an inference deducible from circumstances; and, if inconsistent with the ownership of Ewing's heirs or legal rep-

resentatives, they may never have heard of or known anything of it. It is significant that he never had possession of the original certificate after he transferred them to Ewing, but had to procure duplicates of the originals by making affidavits of their loss. But it is needless for us to pursue this discussion further to show that the evidence is wholly insufficient to establish as a matter of fact, much less as a matter of law, that Ewing ever reconveyed the certificates to Black. It is improbable that such transfer was made to Black, or his wife after his death, by S. Peacock and James Denison, Ewing's executors, for they simply held the property of the testator in trust for Juliet Stanton under Ewing's will, and were not empowered by it to convey the property. Nor could such a transfer have been made by Juliet Stanton, for the legal title to the property was in the executors of William G. Ewing's will, nor could such transfers have been made after her death by her son, William E. Stanton, the appellee, for he has been a lunatic ever since. Is there any presumption that can be invoked in aid of appellants in establishing their proposition? None that we know of under the facts in this case. While a grant may be presumed from undisturbed possession, use, or enjoyment continuously for the period of 10 years, such presumption cannot be raised from the facts in this case, which negative the possession both of the original certificates and of the land by either Black or his wife after the date of the conveyance to Ewing. Goode v. Lowery, 70 Tex. 150, 8 S. W. 73; White v. McCullough, 120 S. W. 1093; Ryle v. Davidson, 116 S. W. 826; Saxton v. Corbett, 122 S. W. 80; Herndon v. Vick, 89 Tex. 475, 35 S. W. 141; Humphreys v. Edwards, 89 Tex. 512, 36 S. W. 333, 434; Pratt v. Townsend, 125 S. W. 112; Frugia v. Trueheart, 48 Tex. Civ. App. 513, 106 S. W. 737; Brewer v. Cochran, 45 Tex. Civ. App. 179, 99 S. W. 1033; Texas Tram Lumber Company v. Gwin, 52 S. W. 111; Grayson v. Lofland, 21 Tex. Civ. App. 503, 52 S. W. 123; Jones v. Reus, 5 Tex. Civ. App. 628, 24 S. W. 677; Satterwhite v. Rosser, 61 Tex. 172; Adams v. House, 61 Tex. 641; Garner v. Lasker, 71 Tex. 431, 9 S. W. 332.

The principle upon which the presumption of a grant rests is thus illustrated by Lord Plunket: "If time destroys the evidence of title, the laws have wisely and humanely made the length of possession a substitute for that which it has destroyed. He comes with his scythe in one hand to mow down the muniments of our rights; but in his other hand the law-giver has placed an hourglass, by which he metes out, incessantly, those portions of duration which render needless the evidence of title he has swept away." The principle so aptly and beautifully illustrated by the quotation does not obtain here. Time with his scythe has not moved down the evidence of plaintiff's title, nor has the hourglass the law-giver has placed in his hand

measured the duration of such possession as would confer title in another. During the only period that it could be claimed, with the slightest plausibility, there was such possession as would authorize the presumption of a grant, the appellee has been a hopeless lunatic, and incapable of making a grant or transfer. Besides, when the hand of God shatters one's mind, the hand of the law-giver shatters the hourglass, so that the sands of time may not run against his rights.

[6] Here we will remark that, even had it been shown that Black and his wife had such possession as would go towards supplying a predicate for the presumption of a grant, such possession could not be tacked on to such possession as the appellants claim through tenants; for the reason that they do not claim through either Black or his wife, but through the young man, "August," who had no title under either of them by purchase, devise, or inheritance, nor any, as far as shown by the evidence, from any other source. Again, the possession claimed by appellant Bangs and his ancestors through John O'Brien and O. Mitchell was not such actual occupancy, use, or enjoyment of the premises as from which a grant could be presumed as a matter of law. The second proposition asserted under this assignment is: "Under the evidence the plaintiff's claim is barred by the five and ten year statutes of limitations, and therefore the court should have instructed the jury to return a verdict for the defendants." The evidence upon the questions presented by the proposition was not such as would authorize the court to instruct the jury as matters of law that the plaintiff's cause of action was barred by either the five or ten year statute of limitations. Indeed, it may be doubted whether there was any evidence authorizing the court to submit the issues of limitation under either the five or ten year statute to the jury.

[7] There was no possession of the land under any claim of title by any person until nearly two years after the appellee was adjudged a lunatic. Prior to such adjudication, there was no occupation of the land under any claim of title or right to the property whatever. The possession of O'Brien under the lease of McComb's estate, if it can be called possession within the meaning of the five and ten year statutes, did not begin until after appellee had been adjudged insane and confined in the lunatic asylum. We do not think that his possession or Mitchell's was accompanied with such actual occupancy, cultivation, use, or enjoyment as would confer title under either statute.

[8] Nor do we think that appellee's title to the land is affected by the doctrine of stale demand, as is urged in the third proposition under this assignment, for the reason that stale demand cannot be asserted by one who is a stranger to the legal title. League v. Henecke, 26 S. W. 731; Baker v. McFarland, 77 Tex. 294, 13 S. W. 1042; Wright v. Dunn,

73 Tex. 295, 11 S. W. 330; Edwards v. Gill, 5 Tex. Civ. App. 203, 23 S. W. 742; McCoy v. Pease, 19 Tex. Civ. App. 657, 48 S. W. 208; Neyland v. Ward, 22 Tex. Civ. App. 369, 54 S. W. 604; Murphy v. Welder, 58 Tex. 236; Moss v. Berry, 53 Tex. 632.

[9] The second assignment complains of the court's refusal of defendant's request to give this special charge: "Though a deed may be an absolute straight-out conveyance in form, nevertheless, if it is given as security for a debt, it is in legal effect a mortgage. A deed may be shown to be a mortgage by circumstantial evidence as well as by direct evidence. Therefore you are charged that, if you believe from all the evidence and circumstances in this case that the transfer from Black to Ewing was to secure a debt or was given as security, then it was a mortgage, and the defendants would be entitled to recover." While the requested instruction states correctly an abstract principle of law, there was no evidence in this case upon which it could be predicated as a charge. Hall v. Jennings, 104 S. W. 491; 3 Pomeroy's Eq. § 1196.

What we have said in disposing of the first assignment of error and the several propositions thereunder disposes of the third assignment, which complains that the verdict is contrary to the evidence, in that the circumstances show that J. W. Black acquired and had title to the certificates after the date of his transfer to Ewing adversely to appellants.

[10] While the admission of the evidence complained of by the fourth assignment may have been error, and we are inclined to the opinion that it was, such error was harmless, inasmuch as the undisputed evidence, outside of that which is the subject of the assignment, shows that the appellee was adjudged a lunatic by a court of competent jurisdiction, and under and by virtue of such judgment was committed to the lunatic asylum on April 21, 1887, where he has continuously ever since been held as a prisoner by the authority of the state of Texas. Such adjudication was in the nature of a proceeding in rem, fixing the status of appellee as a lunatic, and, in so far as it affects his rights, is notice to every one while it subsists and is in force by imprisonment of the lunatic. Since appellee's commitment no spark of reason has ever come from his "mind diseased." Under the evidence, the court might well have instructed the jury that, inasmuch as defendants did not take any kind of possession of the land until June 10, 1887, they could not assert limitation as a defense against plaintiff who was then, and has been continuously ever since, under the disability of lunacy.

[11] Clearly the complaint upon which the inquisition of lunacy was heard was admissible in evidence for the purpose of showing that the jurisdiction of the county court was properly invoked in such proceeding, the judgment admissible as prima facie evidence at least of lunacy, and the warrant of commitment to the asylum issued by the county judge and the return thereon made by the sheriff evidence of the execution of such judgment upon the lunatic. See Grimes v Shaw, 2 Tex. Civ. App. 20, 21 S. W. 718; 7 Ency. Ev. pp. 477, 478. Were this not so, scoundrels would be prowling through our lunatic asylums, seeking under the guise of contract to obtain the property of their unfortunate demented inmates, and, when the form of such a contract should be obtained from one of them, take possession of the property under it, and, when called upon to restore it, appear in court, and, with unblushing affrontery, assert that the burden of proving lunacy was upon the party claiming it and his consequent incapacity to contract to establish his cause of action or ground of defense.

[12] There was no error in the court's exclusion of the evidence relative to the nuncupative will of Mrs. Elizabeth C. H. Black and the probate of the same, as complained by the seventh and eighth assignments of error. At no period of the history of this state has a nuncupative will had the effect to pass title to real property. Lewis v. Aylott, 45 Tex. 190; Furrh v. Winston, 66 Tex. 525, 1 S. W. 527; Moffett v. Moffett, 67 Tex. 646, 4 S. W. 70; Wooldridge v. Hancock, 70 Tex. 18, 6 S. W. 818; Schouler on Wills and Administration, §§ 362, 363. Hence such a will could form no link in defendants' chain of title.

[13] There was no error in the court's refusing to exclude the written transfer of the certificates in question from Black to Ewing, as is complained in the ninth assignment. The law in force at the time of execution and proof of such instrument for record was the act of February 5, 1841 (Laws 1840–41, p. 169, § 20), and under such act the instrument was properly authenticated for registration, and therefore properly admitted in evidence. Pasch. Dig. art. 4977; 2 Gammill's Laws, 633; Houck on Written Instruments, § 364; Holmes v. Coryell, 58 Tex. 680; Coryell v. Holmes, 2 Posey, Unrep. Cas. 665.

The part of the court's charge complained of by the tenth assignment is more favorable to the defendants than could reasonably be expected; for to our minds it does not appear from the evidence that defendant proved such possession of the land since June 10, 1887, as would support their pleas of limitations; and that, even had such possession been proved, it clearly appears that during the period of such possession Stanton was in prison as a lunatic, and the statute could not for that reason run against him. There was no evidence upon which the special charge, the refusal of which is the subject of the eleventh assignment, could be predicated. Hence it was properly refused. Those portions of the court's general charge which are complained of in the twelfth and

fourteenth assignments are, if anything, more favorable to the defendants than was warranted by the law and the evidence, and hence afforded no ground for reversing the judgment.

There is no error assigned which would authorize us to reverse the judgment, and it is affirmed.